Slip Op. 06-78

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                         :
SINOPEC SICHUAN VINYLON WORKS,           :
                                         :
          Plaintiff,                     :
                                         :
     v.                                  :
                                         :
UNITED STATES,                           :     Before: Judith M. Barzilay, Judge
                                         :     Court No. 03-00791
          Defendant,                     :     Public Version
                                         :
CELANESE CHEMICALS, LTD.,                :
E.I. DUPONT DE NEMOURS & CO,             :
                                         :
          Defendant-Intervenors.         :
_____:

OPINION

[Upon Plaintiff's USCIT Rule 56.2 motion for judgment on the agency record, the Department of Commerce's remand results are affirmed in part, and the case is remanded to Commerce.]

Dated: May 25, 2006

*Garvey Schubert Barer* (*Ronald M. Wisla*), *J. Patrick Briscoe*, *William E. Perry*, *Lizabeth R. Levinson*, for Plaintiff Sinopec Sichuan Vinylon Works.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director; (*Patricia M. McCarthy*) Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); *Arthur D. Sidney,* Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

*Wilmer, Cutler, Pickering, Hale & Dorr, LLP* (*Atman M. Trivedi*), *Ronald I. Meltzer*, *Jack A. Levy*, for Defendant-Intervenors Celanese Chemicals, Ltd., & E.I. DuPont de Nemours & Company.

*Williams, Mullen, Clark & Dobins* (*James R. Cannon, Jr.*), *Dean A. Barclay*, for Amicus Solutia, Inc.

## I. Introduction

This case evaluates remand results from the Department of Commerce ("Commerce") produced in response to this court's order in *Sinopec Sichuan Vinylon Works v. United States*, 29 CIT __, 366 F. Supp. 2d 1339 (2005) ("*Sinopec I*").[1] On August 11, 2003, Commerce published a final determination that found Plaintiff Sinopec Sichuan Vinylon Works ("SVW"), a producer and exporter of polyvinyl alcohol ("PVA") from the People's Republic of China ("China" or "PRC"), to be dumping PVA into the United States market and that calculated a final dumping margin of 6.91 percent. *See Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from the People's Republic of China*, 68 Fed. Reg. 47,538 (Aug. 11, 2003), *as amended*, 68 Fed. Reg. 52,183 (Sept. 2, 2003). The period of investigation ("POI") covered January 1, 2002, to June 30, 2002. In response to these findings, Plaintiff brought suit to contest Commerce's decisions in four areas: (1) Commerce's decision to not apply the "self-produced" rule to SVW's joint-venture ("JV") produced inputs; (2) Commerce's use of a value-based methodology to allocate costs between acetylene and acetylene tail gas, instead of a heat-of-combustion based methodology; (3) the use of only the ceiling price of published Indian natural gas prices as the surrogate value for natural gas; and (4) Commerce's decision regarding when and how to apply a by-product credit in the calculations of Plaintiff's normal value ("NV"). *See Sinopec I*, 366 F. Supp. 2d at 1340.

This court affirmed Commerce's results with respect to issue (2), Commerce requested a voluntary remand on issue (3), and the court remanded the two remaining issues. *See id.* Specifically, the court found that with respect to issue (1), Commerce did not sufficiently explain

---

[1]Familiarity with the procedural history and reasoning of *Sinopec I* is presumed.

the relationship between corporate organization and deciding whether inputs qualified as self-produced.  The court also ordered Commerce to address Plaintiff's argument that because Jubilant, the Indian surrogate producer used to formulate the relevant data, possessed a more vertically integrated[2] corporate structure than SVW, using Jubilant's figures would grossly inflate SVW's estimated overhead.  *See id.* at 1344-45.  Finally, on issue (4) the court determined that while Commerce accounted for SVW's acetic acid recovery[3] in its calculations, it did not adequately consider the firms' differing levels of integration and "the fact that Jubilant's overhead costs are not representative of SVW's."  *Id.* at 1350.  Commerce needed to either "sufficiently explain[] its decision to apply Jubilant's financial ratios" without accounting for the greater costs Jubilant endures during acetic acid production, "a process which . . . SVW does not undergo," or make adjustments to its calculations.  *Id.* at 1351.

## II. Jurisdiction & Standard of Review

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c).  The court "must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'"  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consol. Edison Co. of N.Y. v.*

---

[2]Vertical integration refers to the "[c]ombination of two or more businesses on different levels of operation such as manufacturing, wholesaling and retailing the same product." *Deluxe Black's Law Dictionary* 809 (6th ed. 1990).

[3]Jubilant does not perform this process.

*NLRB*, 305 U.S. 197, 229 (1938)) (quotations omitted).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966)) (quotations omitted).  The court therefore "affirms Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions." *Olympia Indus., Inc. v. United States*, 22 CIT 387, 389, 7 F. Supp. 2d 997, 1000 (1998) (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984)).  It may not "substitut[e] its judgment for that of the agency." *Hangzhou Spring Washer Co. v. United States*, 29 CIT ___, ___, 387 F. Supp. 2d 1236, 1251 (2005) (citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994)).

### III. Discussion

**A. Commerce's Evaluation of Sinopec Sichuan Vinylon Works' Acetic Acid Inputs**

**1. Commerce's Position**

After remand, Commerce again determined that the acetic acid that SVW purchases from its PRC-based JV[4] does not constitute a self-produced input and valued SVW's acetic acid consumption using a surrogate value on the acetic acid itself obtained from India.  *See Remand Results* at 4.  Commerce explains this decision by highlighting 19 C.F.R. § 351.401(f)[5] and

---

[4]SVW is a [          ] in the JV.  *See Final Results of Redetermination Pursuant to Court Remand* at 14 ("Remand Results").

[5]In relevant part, 19 C.F.R. § 351.401(f), also known as the collapsing regulation, reads:
(1) In general.  In an antidumping proceeding under this part, the Secretary will
treat two or more affiliated producers as a single entity where those producers
have production facilities for similar or identical products that would not require
substantial retooling of either facility in order to restructure manufacturing
priorities and the Secretary concludes that there is a significant potential for the

noting that SVW and the JV do not meet the requirements of the regulation's collapsing factors,

a finding that attests to a high level of independence between the companies. *See Remand*

*Results* at 4. While not in itself dispositive, corporate organization, as viewed through the lens of

the collapsing factors, can clarify the "level of integration" between the firms and elucidate

"whether SVW's production facility is sufficiently similar to" that of the JV so that Commerce

may treat SVW as the producer[6] of the acetic acid. *Remand Results* at 5. In this case, Commerce

found that SVW "does not self-produce acetic acid because it purchased its acetic acid and it is

not fully integrated with respect to acetic acid production." *Remand Results* at 7. Furthermore,

although SVW purchases acetic acid from an affiliated[7] JV, facts on record demonstrate that "1)

SVW and its supplier [     ] are legally separate corporate entities; 2) SVW does not produce

acetic acid within its corporate production facility; and 3) SVW purchases acetic acid that was

produced in a separate, although affiliated, corporate production facility." *Remand Results* at 10;

---

manipulation of price or production.
(2) Significant potential for manipulation. In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include: (i) The level of common ownership; (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and (iii) Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities of employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f). The elements described in this regulation are known commonly as the "collapsing factors."

[6]Commerce defines "producer" as "the corporate entity(s) actually producing the subject merchandise." *Remand Results* at 10 (citing *Anshan Iron & Steel Co. v. United States*, 2003 WL 22018898 (CIT 2003) (not reported in F. Supp.)).

[7]Sinopec is "affiliated" with its JV because Sinopec owns over [     ] of its shares. *See* 19 U.S.C. § 1677(33)(E).

*see Remand Results* at 14-16.  Commerce therefore turned to the Indian surrogate to value the acetic acid.

### 2. Plaintiff's Position

Plaintiff SVW responds that in failing to treat SVW's acetic acid purchases as self-produced, Commerce has disregarded its statutory mandate, which requires that Commerce calculate NV "based on the 'factors of production utilized in producing the merchandise.'"  Pl.'s Cmts. 2, 3 (citing 19 U.S.C. § 1677b(c)(1)).  Plaintiff also insists that Commerce has deviated from its practice of "us[ing] factors of production only for inputs that are manufactured by the producer of the subject merchandise *or by its affiliates*," and that by using the surrogate value for acetic acid, Commerce has not used the "best available information."  Pl.'s Cmts. 2, 3.  Further, Plaintiff asserts that Commerce has improperly focused on the fact that Plaintiff and its JV are "legally separate entities" to the exclusion of other factors that may demonstrate a high level of vertical integration between the two firms.  Pl.'s Cmts. 4.  Plaintiff avers that according to Commerce precedent, because Plaintiff owns a [      ] interest in its JV, its acetic acid purchases qualify as "captively-produced," i.e. self-produced, inputs, and Commerce must value the acetic acid's factors of production rather than the acetic acid itself.[8]  Pl.'s Cmts. 2 (quoting *Final Determination of Sales at Less Than Fair Value: Coumarin from the People's Republic of China*, 59 Fed. Reg. 66,895, 66,899 (Dec. 28, 1994).  Furthermore, SVW contests the use of the collapsing factors as irrelevant to the inquiry.  *See, e.g.*, Pl.'s Cmts. 5-6, 14.

---

[8]Here, the court notes that valuing the acetic acid's factors of production would not preclude Commerce's use of surrogate values for those factors.

### 3. Analysis

In non-market economy ("NME") cases, such as this one, Congress has instructed Commerce to employ "the best available information" when calculating the NV of subject merchandise. 19 U.S.C. § 1677b(c)(1). If Commerce cannot obtain adequate information from the NME firm or country, it alternatively may base its calculations on "comparable . . . subject merchandise . . . produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country." 19 U.S.C. § 1677b(c)(2); *see* 19 C.F.R. § 351.408(a). Contrary to SVW's claims, Commerce has no obligation to use the JV's factors of production costs; nor, as reflected in 19 U.S.C. § 1677b(c)(2) (outlining when and how to employ surrogate values in NME cases), do the JV's factors of production costs necessarily constitute the best information available.

Section 1677b(c)(1), in fact, "grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." *CITIC Trading Co. v. United States*, 27 CIT ___, ___, 2003 WL 1587093, at *6 (2003) (not reported in F. Supp.) (quoting *Timken Co. v. United States*, 25 CIT 939, 944, 166 F. Supp. 2d 608, 616 (2001) (quotations omitted)); *see Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001); *CITIC Trading Co.*, 2003 WL 1587093, at *14 ("[N]othing in the [statute] or its legislative history mandates that Commerce must derive foreign market values exclusively from either actual prices paid by the nonmarket economy, or from surrogate-based values." (quoting *Lasko Metal Prods., Inc. v. United States*, 16 CIT 1079, 1082, 810 F. Supp. 314, 317 (1992)) (quotations omitted) (second brackets in original)).

In this instance, Commerce first must determine whether SVW exercises control over its JV to the extent that acetic acid transactions between the firms no longer occur at arms' length. *See* 19 C.F.R. § 351.102(b). If it exercises such control,[9] which often becomes manifest through the firms' organizational and financial structure, Commerce should treat the JV's acetic acid as SVW's self-produced input. However, if the firms do not operate in such an integrated manner, Commerce may not treat the acetic acid as self-produced by SVW. Next, Commerce must determine whether it should employ surrogate values to calculate the NV of the input it found appropriate to examine in the first step, be it the acetic acid or the acetic acid's factors of production. *See* 19 C.F.R. § 351.408(a).

While Commerce does not traditionally look to the collapsing regulation 19 C.F.R. § 351.401(f) to determine whether an input of subject merchandise is self-produced,[10] select aspects of the regulation nevertheless provide acceptable tools to examine the depth of integration and business control that a firm shares with another, and remains consistent with Commerce's underlying practice. *See Hangzhou Spring Washer Co.*, 387 F. Supp. 2d at 1248-49 ("Commerce has articulated its preference for surrogate prices over build-up prices in its determinations when a producer is not fully integrated. . . . 'If the NME . . . . firm was not integrated, . . . [Commerce] value[s] the purchased [product] and not the factors [of production].'" (quoting *Issues and Decision Memorandum for the Antidumping Duty*

---

[9]With respect to "affiliated persons," such as SVW and its JV, "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33).

[10]The collapsing regulation customarily is applied to determine the degree of horizontal integration between parties.

*Investigation of Polyvinyl Alcohol from the People's Republic of China*, A-570-879, cmt. 1

(Dep't Commerce Aug. 4, 2003)) (first, third & fourth brackets in original) (third ellipses in

original)); *cf. Anshan Iron & Steel Co. v. United States*, 27 CIT ___, ___, 2003 WL 22018898, at

*6 (2003) (not reported in F. Supp.).  Specifically, the factors in 19 C.F.R. § 351.401(f)(2)

present a series of tests to determine whether there exists a significant potential for price

manipulation, which would attest to a high degree of vertical integration.  In contrast, the general

elements laid out in 19 C.F.R. § 351.401(f)(1) reveal nothing about vertical integration between

firms, and Commerce's use of these factors to assess the relationship between SVW and its JV is

inappropriate.  *See, e.g.*, *Remand Results* at 5 (insisting that dissimilarity of SVW and its JV's

production facilities indicates firms not vertically integrated), 10 (asserting that lack of acetic

acid production in SVW's facilities demonstrates that SWV and its JV not vertically integrated),

14 (claiming that because SVW and its JV's production facilities would require substantial

retooling to produce similar or identical products indicates that companies not vertically

integrated).

Commerce's narrow focus on the fact that SVW and the JV are legally distinct entities

deviates from its prior methodology and fails to adequately address a central tenet of

antidumping margin calculation: Affiliated parties often have the potential to manipulate the

prices and costs of their transactions with each other – a potential not coextensive with the *de

jure* unity or independence of the parties, as Commerce suggests.  *Compare Remand Results* at

10, 13-14, *with* 19 U.S.C. § 1677(4)(B) ("[A] party shall be considered to directly or indirectly

control another party if the party is legally *or operationally* in a position to exercise restraint or

direction over the other party.") (emphasis added) *and* 19 C.F.R. § 351.102(b) ("Affiliated

persons . . . . In determining whether control over another person exists, . . . the Secretary will consider the following factors, among others: corporate or family groupings; franchise or *joint venture agreements . . . .*") (emphasis added). In fact, Commerce has previously counted as self-produced inputs a NME firm's purchases from completely unaffiliated sources. *See, e.g.*, *Final Determination of Sales at Less Than Fair Value: Wooden Bedroom Furniture from the People's Republic of China*, 69 Fed. Reg. 67,313, (Dep't Commerce Nov. 17, 2004). Whether companies possess separate legal identities has never formed the basis of Commerce's methodology. Aside from examining the legal connections between SVW and its JV, Commerce must examine the possibility of SVW exerting *de facto* control over the JV. *Cf. Shangdong Huarong Gen. Group Corp. v. United States*, 27 CIT ___, ___, 2003 WL 22757937 at *17 (2003).

Stripped of these unlawful and inadequate means of examining the relationship between Plaintiff and its joint-venture – respectively the first prong of the collapsing factor test and a test based solely on the legal identity of the JV and SVW – Commerce is left with only circular arguments to buttress its refusal not to treat SVW's acetic acid purchases as self-produced. *See, e.g.*, *Remand Results* at 5 ("[T]he Department cannot value the inputs used to produce acetic acid as SVW's own factors of production because SVW does not self-produce acetic acid . . . ."), 8 ("[W]hen the producer of subject merchandise obtains its factor(s) from a separate supplier entity, as SVW does in this case . . . ."). It provides too little explanation and guidance as to how it reached its conclusion. *See CITIC Trading Co.*, 2003 WL 1587093 at *14; *cf. China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1359 (2003) (stating that Commerce decisions must be "reached by reasoned decisionmaking [sic], including . . . a reasoned explanation supported by a stated connection between the facts found and the choice made." (ellipses in

original) (quotations omitted)).  Commerce's treatment of SVW's acetic acid is REMANDED

for further analysis and explanation not inconsistent with this opinion.

## B. The Surrogate Value for Natural Gas

In its original determination, Commerce calculated the surrogate value of natural gas used

in SVW's PVA production as the ceiling price provided by the Gas Authority of India, Ltd.

("GAIL"), for the period of investigation, but later requested a voluntary remand on this issue.

*See Sinopec 1*, 366 F. Supp. 2d at 1340.  Commerce's revised calculation averages the floor and

ceiling natural gas prices supplied by GAIL, as "[i]t is clear . . . that consumers pay a range of

prices and not merely the ceiling."  *Remand Results* at 47; *see Remand Results* at 17.  No party

contests this modification.  Because substantial record evidence supports the basis for this new

calculation, and since the calculation conforms to the requirements established by 19 U.S.C. §

1677b(c) (outlining methods for deriving NV of subject merchandise for NME countries) and 19

C.F.R. § 351.408 (same), Commerce's use of the revised surrogate value for natural gas is

AFFIRMED.

## C. Sinopec Sichuan Vinylon Works' Overhead Costs[11]

To calculate SVW's final antidumping margin, Commerce relied on the factory overhead

ratios; selling, general, and administrative expenses ("SG&A"); and profit statements from the

---

[11]The court will not discuss Plaintiff's contention that Commerce should apply a by-product credit related to the recovery of acetic acid *after*, rather than *before*, applying the financial ratios, since the court affirmed this practice in *Sinopec I. See Sinopec I*, 366 F. Supp. 2d at 1351; *Remand Results* at 47.  Crucially, though, the court did not hold that application of the by-product credit in itself conformed with Commerce's obligations.  Immediately after affirming Commerce's decision to apply the by-product credit after the financial ratios, the court noted that Commerce still "ha[d] not sufficiently explained its decision to apply Jubilant's financial ratios *without accounting for the greater costs incurred by Jubilant*."  *Sinopec I*, 366 F. Supp. 2d at 1351 (emphasis added).

Indian surrogate company Jubilant. *See Remand Results* at 17. It chose Jubilant because

> 1) it was a producer of comparable merchandise during the POI; 2) it produced in the chosen surrogate country (*i.e.*, India); 3) its financial statements were contemporaneous with the POI; and 4) its production process for PVAc was comparable to that of SVW's for PVA, given that the two companies produced at "equivalent levels of vertical integration."

*Remand Results* at 18. On remand, the court ordered Commerce to examine whether Jubilant had a higher level of vertical integration than SVW because, among other factors, Jubilant produced its acetic acid, while SVW purchased acetic acid from an affiliate. Greater vertical integration could indicate that Jubilant incurred higher capital and fixed overhead costs than SVW, which might require Commerce to recalculate its cost figures for SVW. *See Remand Results* at 18-19.

### 1. Commerce's Position

Although Commerce recognizes differences in the production methods and resulting products between SVW and Jubilant, it maintains that "the two companies operate at equivalent integration levels with respect to the production of PVA and [          ].[12] *Remand Results* at 20. "Jubilant is more vertically integrated in some aspects of its production of PVAc and less vertically integrated in others" when compared to SVW. *Remand Results* at 22. To bolster its stance, Commerce notes that "[i]n the vast majority of the antidumping duty cases, the surrogate

---

[12]

Jubilant begins its production process with ethanol, which it either purchases or makes by a simple process from molasses . . . Jubilant processes ethanol into ethylene which it turns into VAM and then, ultimately, into [     ], a comparable product to PVA. In contrast, . . . SVW produces PVA using acetylene manufactured from additional self-produced inputs, and it hydrolyzes VAM into PVA (a further processed version of PVAc).

*Remand Results* at 19 (ellipses in original).

producers selected by [Commerce] produce different products and incur different types of costs than the respondents. In these situations, our practice has been not to attempt to adjust the surrogate producer's overhead figures to account for potential cost differences." *Remand Results* at 20 (citing *Notice of Final Determination of Sales at Not Less Than Fair Value: Pure Magnesium from the Russian Federation*, 66 Fed. Reg. 49,347 (Dep't Commerce Sept. 27, 2001); *Notice of Final Determinations of Sales at Less Than Fair Value: Pure Magnesium and Alloy Magnesium from the Russian Federation*, 60 Fed. Reg. 16,440, 16,446-47 (Dep't Commerce Mar. 30, 1995)). Furthermore, Commerce asserts that "any finding . . . that Jubilant's overhead is overstated vis-a-vis SVW's production experience because it includes depreciation expenses related to the manufacture of acetic acid – and then attempting to adjust for these differences – could introduce unintended distortions into the data." *Remand Results* at 21. Therefore, Commerce again decided not to adjust Jubilant's overhead ratio to account for acetic acid production or other manufacturing differences between the two companies. *See Remand Results* at 22.

**2. Plaintiff's Position**

SVW protests that by not revising its calculations to account for capital costs Jubilant endures by producing acetic acid and for Jubilant's supposedly higher overhead costs, SG&A, and profit attributable to its manufacturing and sale of more products and by-products than SVW, Commerce has acted unlawfully. *See* Pl.'s Cmts. 15. SVW avers that by making upward adjustments to its NV to account for its PVA production from PVAc – a process Jubilant does not undergo – while refusing to make downward adjustments for Jubilant's acetic acid production and other expenses, Commerce has "fail[ed] to provide a fair and accurate

measurement of SVW's normal value." Pl.'s Cmts. 16. This disparate treatment between upward and downward adjustments violates 19 U.S.C. § 1677b(c)(3)(D), which requires factors of production to include a "representative capital cost." Pl.'s Cmts. 18 (quoting 19 U.S.C. § 1677b(c)(3)(D)). SVW contends that "since Commerce determined that the [sic] Jubilant and SVW are at 'equivalent levels of vertical integration,' common sense . . . dictate[s] that there should . . . be[] no need for Commerce to have made an upward adjustment to SVW's normal value in the first place." Pl.'s Cmts. 19. Likewise, SVW maintains that Commerce illegally double-counted the overhead, SG&A, and profit attributable to SVW's consumption of acetic acid when it used the surrogate price for SVW's acetic acid inputs – which SVW claims "necessarily incorporated overhead, SG&A, and profit attributable to SVW's purchased acetic acid inputs"– and also applied the acetic acid-producing surrogate's financial ratios to SVW's production costs. Pl.'s Cmts. 17.

### 3. Analysis

While Commerce's refusal to adjust its calculations to compensate for SVW and Jubilant's differing levels of vertical integration has basis in both statutory and case law, its reasoning rings hollow in light of its willingness to incorporate a by-product credit for SVW's acetic acid recovery into its figures.

> Commerce does not generally adjust the surrogate values used in the calculation of factory overhead. . . . [O]nce Commerce establishes that the surrogate produces identical or comparable merchandise, closely approximating the nonmarket economy producer's experience, Commerce merely uses the surrogate producer's data.
> . . . .
> Unless there is substantial evidence in the record which supports a finding that the surrogate producers are less integrated that [sic] the PRC producers, and as a result have a lower overhead ratio, Commerce cannot depart from its standard practice.

*Rhodia, Inc. v. United States*, 26 CIT 1107, 1110-11, 240 F. Supp. 2d 1247, 1250-51 (2002) (citations omitted); *see, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value; Polyvinyl Alcohol from the People's Republic of China*, 61 Fed. Reg. 14,057, 14,060 (Dep't Commerce Mar. 29, 1996); *Synthetic Indigo from the People's Republic of China; Notice of Final Determination of Sales at Less Than Fair Value*, 65 Fed. Reg. 25,706, 25,706-07 (Dep't Commerce May 3, 2000); *Certain Helical Spring Lock Washers from the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 13,401, 13,404 (Dep't Commerce Mar. 18, 1999); *see* 19 C.F.R. § 351.408(c)(4). In this case, Commerce has repeatedly maintained that "Sinopec and Jubilant are at equivalent stages of integration." Def.'s Resp. 8; *see, e.g.*, Def.'s Resp. 9; *Remand Results* at 18, 54. It also has consistently reiterated that making adjustments for perceived differences in the firms' vertical integration would create only an illusion of increased accuracy. *See, e.g.*, Def.'s Resp. 10-11; *see Remand Results* at 55-56; Def.'s Resp. 11 ("Commerce does not adjust a surrogate producer's overhead to account for potential cost differences, because the agency would be required to evaluate whether both the surrogate company and the respondent possess identical cost structures, and then adjust the companies' cost structures upon a line-by-line basis to account for all differences." (citing *Remand Results* at 20-21)).

Commerce cannot have it both ways. It may not arbitrarily invoke prior practice to buttress a blanket refusal to adjust for cost differentials that would benefit a party and simultaneously abandon this prior practice to include adjustments that disadvantage that same party. The court understands that "the process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise." *Hangzhou*

*Spring Washer Co.*, 387 F. Supp. 2d at 1245 (quoting *Nation Ford Chem. Co. v. United States*,

166 F.3d 1373, 1377 (Fed. Cir. 1999)) (quotations omitted).  Yet, although Commerce has

"broad discretion to determine the 'best available information' in a reasonable manner," this

discretion requires that "Commerce's choice of what constitutes the best available information

evidence[] a rational and reasonable relationship to the factor of production it represents."  *CITIC*

*Trading Co.*, 2003 WL 1587093, at *6 & n.12 (citations & quotations omitted); *see Hangzhou*

*Spring Washer Co.*, 29 CIT at ___, 387 F. Supp. 2d at 1246; *Peer Bearing Co.-Changshan v.*

*United States*, 27 CIT ___, ___, 298 F. Supp. 2d 1328, 1336 (2003).  Currently, Commerce's

methodology does not meet this standard.  Commerce must revise its calculation methods on

remand so that they avoid these unreasonable inconsistencies.

     In addition, by refusing to adjust SVW's NV to strip out costs that Jubilant incurs by

producing acetic acid – as explained above, a process that SVW does not undergo – while using

the surrogate acetic acid input price, Commerce seems to have double counted the overhead,

SG&A, and profit stemming from Jubilant's acetic acid production.  "Double-counting is to be

avoided" when Commerce makes adjustments to its calculations.  *Holmes Prods. Corp. v. United*

*States*, 16 CIT 628, 632, 795 F. Supp. 1205, 1208 (1992); *see Sigma Corp. v. United States*, 117

F.3d 1401, 1407-08 (Fed. Cir. 1997); 19 C.F.R. § 351.401(b)(2)[13].  *See generally Floral Trade*

*Council v. United States*, 15 CIT 497, 506-07, 775 F. Supp. 1492, 1502-03 (1991) (remanding to

---

[13]In relevant part, the regulation states: (b) Adjustments in general. In making adjustments to export price, constructed export price, or normal value, the Secretary will adhere to the following principles: . . . . (2) The Secretary will not double-count adjustments.  19 C.F.R. § 351.401(b).

Commerce because of multiple incidences of double-counting). On remand, Commerce should adopt a calculation method that avoids double-counting insofar as it is reasonably avoidable.[14]

### IV. Conclusion

For the reasons stated above, the court AFFIRMS revised calculation for the surrogate value for natural gas and REMANDS the case to the Department of Commerce to reanalyze its treatment of Sinopec Sichuan Vinylon Works' acetic acid inputs and the calculation of the firm's overhead costs as discussed in section (C). To perform the requisite overhead cost revisions, Commerce may either adhere to its customary practice of using the surrogate producer's data without adjustment, or it shall reopen the record to obtain data reasonably necessary to adjust Jubilant's overhead so that it accounts for differences between its manufacturing processes and those of SVW. Naturally, Commerce's revised treatment of the SVW's acetic acid purchases shall be reflected in the revisions to SVW's overhead costs. Commerce shall have 60 days after the issuance of this opinion to submit to this court its revised remand results, whereupon Plaintiff and Defendant-Intervenors will have 30 days to submit their responses.

Dated: May 25, 2006 /s/ Judith M. Barzilay
New York, NY Judge

---

[14]Commerce has satisfactorily accounted for the supposed discrepancies between SVW and Jubilant that may result from the different number of products the companies produce. *See Remand Determination* at 23-24; Def.'s Resp. 11-12. The court will not disturb Commerce's treatment of this issue.